## Goldfine et al. v. Sutton, Superintendent

*David W. Yaffe,* for petitioners.
*James F. Ryan,* for respondent.

DAVIS, P. J., December 10, 1940.—Petitioner Charles Goldfine owns and operates the Alden Theatre, at Midvale and Crescent Avenues, Philadelphia.

Petitioner David S. Moliver owns and operates the Viola Theatre, 2402 Germantown Avenue, Philadelphia.

At the Alden Theatre, Charles Goldfine conducted a "Cash Quiz" game. Upon entering the theatre, each patron is presented with a circular card, bearing 13 detachable numbered tabs, and a detachable stub. The card and stub are serially numbered. During the program a film is shown on the screen presenting 13 questions in sequence. Each numbered tab is used to answer the same numbered question, propounded from the screen. If the answer is "right" the tab is left on. If the answer is "wrong" the tab is torn off. The cards are identical, except as to serial numbers, and all the patrons participate. Upon the conclusion of the quiz, the numbered stub is detached and retained by the patron, and the card is deposited in a receptacle. Petitioner decides the correct answers, and the numbers of the cards answered correctly are announced on the same night the following week, when prizes are awarded, in equal amounts, to each winner.

On November 19, 1940, respondent confiscated the film and cards as an illegal lottery.

At the Viola Theatre, David S. Moliver conducted a "Zing-o" game. Upon entering the theatre each patron is presented with a double or duplicate "Zing-o" card, perforated in the centre, and serially numbered for identification only. All the cards are identical, except for the serial number. Each card has 36 spaces, on which are

printed black and white drawings, each of which represents a sound or noise. During the program, petitioner announces from the stage that a playlet, reproduced over the sound system by means of electrical transcription, will be shown, sounds and noises will be heard, which may or may not appear on the card. When the participant properly identifies the sound or noise a tab is pushed in the space which represents it, on both sides of the double card. Persons identifying all sounds and noises correctly receive awards. Punching the wrong tab disqualifies the participant from the contest. Punched spaces need not be in a straight line, or in any particular order. When the playlet is concluded, the cards are separated on the perforated line by the participant, one card is given to an usher, and the duplicate is retained by the patron. Petitioner then announces the correct sounds and noises, and awards the same prize to each and every patron identifying all sounds and noises correctly.

On November 12, 1940, respondent confiscated the electrical transcription and the "Zing-o" cards, as an illegal lottery.

The petitions seek the return of the film and cards, and the electrical transcription and cards.

A lottery incorporates three concurrent elements, viz:

1. A prize or thing of value profferred;

2. To one or more recipients among those participating, who are to be determined through chance or caprice;

3. A consideration having been exacted and/or received for the privilege of participation.

The elements of a consideration and a prize are admittedly present in both cases, and the question for our solution is whether the prizes are determined through chance or skill.

There can be no lottery without the element of uncertainty or chance. The universal acceptation of a game of chance is such a game as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or adroitness are thwarted by chance. Thus, a dice game,

determined by throwing the dice, is a game of chance. In a game of skill nothing is left to chance, but superior knowledge and attention, or superior strength, agility, or practice, gain the victory. Thus, chess, billiards, and bowling are examples of games of skill.. The prize is given, not by chance or lot, but as a reward for the skill of the participants. The result is influenced by the personal effort of the contestant and the means of attaining the result are known. So long as the distribution of prizes depends on skill, purposely exercised by the participants, there is no lottery. It was games of chance that the legislature sought to prohibit by the enactment of section 601 of The Penal Code of June 24, 1939, P. L. 872. This is a penal statute and must be strictly construed, and we find in it no attempt to forbid games of skill.

As a commercial stimulant, quizzes and games of chance and skill presently afford a popular advertising program for the radio sponsor, moving picture theatre, chain grocery, the newspaper, and other commercial enterprises having immediate contact with the public. What many of these contests signify is not a chance to win because of skill, superior knowledge, or conscientious effort, but an opportunity to try one's luck. But since they exact no consideration for the privilege of participation, they are exempt from the taint of illegality.

The games heretofore conducted in the Philadelphia moving picture theatres, which were suppressed as within the social policy of the lottery statute, were games in which the recipients of the prizes were determined through chance.

In Somerson v. Wilson et al., C. P. No. 1, March term, 1937, no. 350, McDevitt, P. J., held the game of "Lucky" illegal.

In Commonwealth v. Superintendent of County Prison, Quarter Sessions 1938, Flood, J., held the game of "Quiz-o" a lottery, where the cards of participants differed in that there were a hundred questions with but 24 spaces on each card; if five easy questions were asked

in order at the beginning of the game, and the answers to those five questions were on the line of the card of one of the participants, that patron would win before the others had any opportunity to exercise any skill.

In "Party" the faces of motion picture actors and actresses constituted the subject matter of the game. As the master of ceremonies called the names of the celebrities, the holder of the card punched the proper face. The master of ceremonies had a number of cards with names before him and the order in which they were called depended upon how they appeared in the pack which he held. The number of combinations and permutations was very great, since the game was operated with seventy-five or a hundred possible faces. The court held that the element of chance clearly predominated over any small element of so-called skill which might be involved. Judge Flood held the game a lottery, and stated there was nothing in these games to compare with the skill necessary to make the various moves in the checker games, referred to in D'Orio v. Startup Candy Co., 71 Utah 410, 266 Pac. 1037, D'Orio v. Jacobs, 151 Wash. 297, 275 Pac. 563, and Boatwright v. The State, 118 Tex. Crim. 381, 38 S. W. (2d) 87, where every participant had an opportunity to play out the game and win, just as he had in Hoff v. Daily Graphic, Inc., 132 N. Y. Misc. 597, and where he was not shut out because some chance let another person win before his game was fully played.

In Commonwealth v. Superintendent of Philadelphia County Prison, Quarter Sessions Court, October term, 1939, the game of "Query-Quiz" was held a lottery. Each patron, upon entering the theatre, was presented with a card which was marked with a serial number on the top and bottom and stamped with the letters "Q-Q". The top portion of the card was torn off and deposited in a receptacle and the lower portion was retained by the patron. On the lower portion of the card there was printed the words "True" and "False," beneath which were numbers running from one to ten inside perforated squares. At

the extreme bottom of the card there was a place for the patron to insert his name and address. During the program the petitioner appeared on the stage with a receptacle containing the top portions of the cards, which had previously been deposited by the patrons. Eight stubs were thereupon drawn from the receptacle and the numbers on the stubs were called, with the request that the persons in the audience, holding these numbers, appear on the stage. Of the eight persons so chosen each was asked two questions and was paid two dollars for each question which he answered correctly. For being called on the stage, whether or not the person was able to answer either of the questions correctly, each of the eight persons was presented with two passes to the theatre. Petitioner, acting as master of ceremonies, asked the questions from a written script which was prepared in advance. When this portion of the program was completed, the entire audience was permitted to compete in a quiz and answer the questions asked by petitioner by punching various perforated squares on the portion of the card which they retained, either under the column listed as "True" or that listed as "False". The choice of the appropriate column depended on the judgment of the contestant. A sum of $25 was awarded to the person whose answers accorded with those of the editor. In the event that a number of persons answered the questions correctly, the sum of money was divided equally among them. If no person answered all the questions correctly, the sum was awarded to the one who answered the greatest number of questions correctly. The winners of the contest and the correct answers were displayed in the theatre lobby the following week. The court held that the first section of the program, which concerned the eight persons who appeared on the stage and competed, was clearly a violation of the lottery law, since they were chosen by lot, and as a reward for appearing on the stage they were given two passes for the theatre, even though they might be unsuccessful in answering any of the ques-

tions. Because the element of chance predominated in determining the result, the court also held that the second part of the program offended the law because the audience had no control over the choice of questions and their composition, nor over the answers which were considered correct, and that the manipulation of these factors could readily change from what appeared to be a game of skill into one of chance.

The element of chance, present in the cases heretofore decided by our courts, does not appear in the cases now before us for consideration.

In the "Cash Quiz" game the theatre management has no control over the questions shown by film, or over the answers. Every participant holds a card with the same questions propounded, and an equal opportunity of receiving an equal award. Whether or not the participant receives an award depends solely upon superior knowledge and skill in answering the questions, and not upon any manipulation over the choice of questions and the answers. It seems too strained a construction to hold that because the audience had no control over the choice of the questions, or over the answers which were considered correct, it could change the "Cash Quiz" game into one of chance, and not of skill.

In the "Zing-o" game the sounds and noises are given in a playlet by electrical transcription. Petitioner has no control over the choice of sounds or of the answers. Every participant receives a like card, has an equal chance to receive an award equal to that received by every other participant, based purely on the skill or ability of each to identify correctly the sounds or noises heard in the transcription. There is no inequality in the prizes, or in the standing of those among whom the awards are distributed.

The only predominating element, in the games as they are intended to be played, is one of skill, and the only factor which can defeat the participant is the lack of ability and skill, and not the element of chance.

The prayer of the petitions is granted.